In the MATTER OF Jerry G. SAENZ:

WISCONSIN DEPARTMENT OF CORRECTIONS,
Petitioner-Respondent,

v.

Jerry G. SAENZ, Respondent-Appellant.

Court of Appeals

*No. 2005AP2750. Submitted on briefs October 18, 2006.
—Decided January 25, 2007.*

2007 WI App 25

(Also reported in 728 N.W.2d 765.)

On behalf of the respondent-appellant, the cause was submitted on the briefs of *Todd G. Smith* and *Linda S. Schmidt* of *LaFollette Godfrey & Kahn*, Madison.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *R. Duane Harlow*, Assistant Attorney General, and *Peggy A. Lautenschlager*, Attorney General.

Before Lundsten, P.J., Dykman and Deininger, JJ.

¶ 1. DEININGER, J. The circuit court entered an ex parte order that authorized the Department of Corrections to have medical staff "provide to Jerry G. Saenz any medication, feeding or hydration, by force or otherwise," deemed medically necessary to protect and maintain Saenz's health. Three weeks later, the court conducted a hearing on Saenz's requests for an examination by an independent physician, an evidentiary hearing and vacation of the treatment order. The court denied these requests and entered an order making its prior treatment order "permanent." Saenz claims the circuit court erred in entering the final order because it deprived him of liberty without his being accorded due process as guaranteed by the Fourteenth Amendment to the U.S. Constitution. We agree, reverse the appealed order and remand to the circuit court for further proceedings consistent with this opinion.

491

## BACKGROUND

¶ 2. Jerry Saenz is an inmate at Waupun Correctional Institution (WCI). The Department of Corrections (DOC) petitioned the Dodge County Circuit Court for an order authorizing it to forcibly administer medical treatment, including food and hydration, to Saenz. The petition, accompanied by affidavits from a deputy warden and a physician, alleged the following:

1. Jerry Saenz is an inmate in the custody and control of the Wisconsin Department of Corrections and is currently housed at the Waupun Correctional Institution (WCI) in Waupun, Wisconsin.

2. Mr. Saenz[] has accepted only two meals since [three weeks before the petition] and has consumed minimal fluids since that date. At this time, medical staff at WCI have determined that Mr. Saenz is suffering from moderate to severe malnutrition and dehydration.

3. Mr. Saenz has indicated he is refusing food and fluids because he is protesting the conditions in segregation. Since beginning his hunger strike Mr. Saenz has lost at least 24 pounds. Mr. Saenz is currently lethargic, refusing to get out of bed and will not verbally respond to staff.

4. The Department is reliably informed by medical opinion that unless Mr. Saenz receives medical treatment, including forced hydration or forced feeding within the next 24 to 48 hours, he is at great risk of suffering serious harm or death.

5. The death of an inmate at a correctional institution under the circumstances described herein would jeopardize the safety, security and good order of said institution. This order is necessary to maintain the security of the institution and the safety of the staff and other inmates housed there, preserve the health and

safety of Mr. Saenz, prevent the manipulation of the corrections system by Mr. Saenz and prevent the state from incurring additional significant medical costs which may result if Mr. Saenz suffers medical complications as a result of his actions.

Neither the petition nor the supporting affidavits cited legal authority in support of the Department's request.

¶ 3. In his supporting affidavit, the WCI deputy warden characterized Saenz's actions as a "ploy periodically used by inmates as a means of manipulating the correctional system and staff." He averred that the Department's interest in forcibly feeding and hydrating Saenz was based on the following:

> [I]f Jerry Saenz dies as a result of a hunger strike, the security at WCI would be significantly adversely affected. It will be adversely affected because inmates expect staff will exercise prudent actions to protect inmates' health, safety and welfare. The failure of correctional staff to take life saving actions and allowing an inmate to die while in custody will destabilize the correctional population. It will also do so because it jeopardizes the inmates' reliance on staff to act in inmates' best interests.
>
> ... [T]o allow an inmate to die by self-imposed starvation will give rise to rumors that staff mistreated the dead inmate, thus causing his death. Inmates are naturally suspicious of staff and correctional management and seldom know all of the information about an incident such as an inmate death and so believe the worst.

The warden also alluded in his affidavit to a 1983 incident at WCI when an inmate's suicide sparked a riot that resulted in several prison staff members being taken hostage.

¶ 4. The Department also submitted an affidavit from a physician employed by WCI. The physician averred that Saenz had eaten only two meals in the past three weeks, he had lost twenty-four pounds and laboratory tests performed on Saenz's urine showed "moderate to severe dehydration and malnutrition." The doctor opined "to a reasonable degree of medical certainty" that, if Saenz "does not receive hydration and/or nutrition within 24 to 48 hours, he will be at risk of suffering intravascular collapse and/or possibly death."

¶ 5. On the same day the Department filed its petition, the circuit court issued an "Order Authorizing Medical Treatment of Jerry G. Saenz," which directed the following:

> [A]ny licensed physician, or a person acting under his or her direction and control, may evaluate and provide to Jerry G. Saenz any medication, feeding or hydration, by force or otherwise, which in his or her medical judgment is necessary to protect and maintain the health of Jerry G. Saenz while he remains in the legal custody of the Department of Corrections.

Upon receiving a copy of the order, Saenz sent a letter to the court requesting a hearing to "address . . . the Dep[artment's] proposed petition calling for blanket and intrusive medical procedures" and to provide the court with an opportunity to "first hand judge Mr. Saenz'[s] mental and physical capabilities, appearance and the like." He also asked the court to "vacate its blanket order" and for the appointment of an independent physician to examine him.

¶ 6. The circuit court, three weeks after it entered the ex parte treatment order, conducted a hearing on Saenz's requests. Both the Department's counsel and Saenz, pro se, appeared by telephone. The court stated at the beginning of the hearing that its purpose was "to

determine whether or not an evidentiary hearing is appropriate for the Court to reconsider the order previously entered requiring involuntary feeding of Mr. Saenz." The Department's counsel affirmed its view that the ex parte order was "permanent unless the Court indicates otherwise," explaining that it wished to avoid having "to go back into court every other week asking for basically the same relief."

¶ 7. Saenz asserted at the hearing that, pursuant to the court's order, he had been forcibly fed or hydrated "on three or four different occasions even though I was eating and drinking," claiming that he had "drank like ten cups of [water] . . . right in front of 'em." Saenz informed the court that he intended to dispute the facts the Department had alleged in its petition, and he explained the reasons for his behavior as follows:

> I'm a mentally ill prisoner, your Honor. Been certified as such. And the conditions just got me real down real bad, depressed and that sort of thing, and they haven't provided no treatment. The only treatment they gave me was the forced medical treatment on me, but the underlying problem is of a mental nature, your Honor, psychological.

Saenz also argued that he had a constitutional right to not be subjected to "intrusion of the body" and that the Department had "not justified the reasons for invading my body."

¶ 8. The circuit court, citing *Cruzan v. Missouri Department of Health*, 497 U.S. 261 (1990), agreed with Saenz that he had "a Fourteenth Amendment liberty interest to refuse unwanted medical treatment, and that medical treatment includes artificial nutrition and hydration." The court also concluded, however, that Saenz's rights "must be balanced against" the Department's interest in properly administering its

495

prisons, citing *Washington v. Harper*, 494 U.S. 210 (1990). The court noted that there did not appear to be a Wisconsin appellate decision directly on point, but that decisions in federal and other state courts had recognized the "compelling governmental interests" as including "preservation of life, prevention of suicide, and maintenance of prison order and discipline."

¶ 9. The circuit court concluded that the Department's affidavits were "basically uncontroverted," and that Saenz "had refused almost all food and significantly limited his fluid intake for approximately 21 days . . . to protest conditions in the prison." The court also cited the physician's averments regarding Saenz's condition and prognosis, and again it noted that Saenz had not controverted them. The court then concluded it would "not hold an evidentiary hearing" or appoint an independent physician. The court told Saenz that WCI "cannot permit you to die" and that it would "continue [its] order requiring that you be subject to an order to treat so that you are not permitted to commit suicide." Saenz appeals the subsequent order incorporating the court's decisions.[1]

## ANALYSIS

¶ 10. The parties initially skirmish over the appropriate standard for our review of the appealed order. The Department, relying on *Harper*, 494 U.S. 210,

---

[1] Saenz commenced this appeal pro se. After reading the parties' initial briefs, we determined that our consideration of this appeal would benefit from having Saenz's claims of error briefed by an attorney. The court expresses its appreciation to Attorneys Todd G. Smith and Linda S. Schmidt of LaFollette Godfrey & Kahn, Madison, for providing Saenz pro bono representation in this appeal under the auspices of the Wisconsin State Bar Appellate Practice Section pro bono project.

argues that we should find the "prison policies" at issue in this case unconstitutional only if the Department's policy or conduct was not "reasonably related to legitimate penological interests." *See id.* at 223–24 (noting that the "reasonably related" standard applies to prison regulations even when "fundamental" constitutional rights of inmates are curtailed and a "more rigorous standard" would otherwise apply to state actions). Saenz responds that there is no prison policy or regulation at issue in this appeal to which we might apply the deferential standard described in *Harper*. Rather, in Saenz's view, the issues, properly framed, are whether he possesses a constitutionally protected liberty interest in avoiding involuntary medical treatment, including forced hydration and nutrition; and, if we conclude that he possess such an interest, whether the circuit court proceedings accorded Saenz the process due him prior to infringing upon that interest. Thus, Saenz asks us to decide these questions of constitutional law de novo, without giving deference to either the judgments of prison officials or the conclusions of the circuit court.

¶ 11. We agree with Saenz that this appeal does not involve a review of a Department or WCI policy or regulation. The Department asserts that its actions in seeking a court order to forcibly feed and hydrate Saenz were based "in part" on certain DOC policies and procedures, but it acknowledges that the policies and procedures it cites are nowhere provided, or even referred to, in the present record. On the Department's motion, we agreed to take judicial notice of certain "Internal Management Procedures" and "Medical Management Guidelines" that the Department claims are relevant to what transpired in this case. We have reviewed the documents in question. They establish

procedures and guidelines for prison personnel to assess, evaluate and report inmates who may be engaging in a "hunger strike."[2] However, except for suggestions that the Department's Office of Legal Counsel may ultimately initiate "court proceedings" and that "legally sanctioned forced interventions" might be implemented in some cases, the procedures and guidelines in question do not, as in *Harper*, establish a standard for forced feeding and hydration or any procedural steps aimed at addressing constitutional due-process concerns.

¶ 12. We note further that Saenz makes no claim that anything in the Department's written policies, guidelines, rules or procedures violated his constitutional rights. Accordingly, we concur with Saenz's assertion that there is no reason that our consideration of this appeal requires deference to the judgment of Department officials regarding policies that are claimed to be "reasonably related to legitimate penological interests." *See Harper*, 494 U.S. at 223–24. For its part, the Department concedes that Saenz possesses a constitutional liberty interest in avoiding unwanted medical treatment, and in particular, the forced nutrition and hydration ordered in this case. Saenz, in turn, acknowledges that his liberty interest in avoiding this unwanted treatment may be balanced against the Department's legitimate governmental and penological interests in preventing him from starving to death. In short, there is no dispute that, under appropriate circumstances and after affording procedural due process, the Department may forcibly feed and hydrate an inmate.

---

[2] According to the judicially noticed documents, "[a]n offender is considered to be on a hunger strike after he/she has not had any fluids to drink for 24 hours or has not eaten for three days."

¶ 13. Given the absence of a dispute over the threshold inquiry regarding Saenz's and the Department's respective interests, we note briefly that the parties' concessions are well founded. The United States Court of Appeals for the Seventh Circuit has recently summarized applicable constitutional holdings in this area:

> Free people who are sane have a liberty interest in refusing life-saving medical treatment, *Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261, 278–79, 110 S. Ct. 2841, 111 L.Ed.2d 224 (1990), and likewise in refusing to eat . . . . But either prisoners don't have such an interest, or it is easily overridden.
>
> The reasons are practical . . . . If prisoners were allowed to kill themselves, prisons would find it even more difficult than they do to maintain discipline, because of the effect of a suicide in agitating the other prisoners. Prison officials who let prisoners starve themselves to death would also expose themselves to lawsuits by the prisoners' estates. Reckless indifference to the risk of a prisoner's committing suicide is a standard basis for a federal civil rights suit. The idea behind liability in such cases is that incarceration can place a person under unusual psychological strain and the jail or prison [is] under a commensurate duty to prevent the prisoner from giving way to the strain. The analysis is applicable when suicide takes the form of starving oneself to death.
>
> So at some point in [the inmate]'s meal-skipping the prison doctors would have had a duty and certainly a right to step in and force him to take nourishment.

*Freeman v. Berge*, 441 F.3d 543, 546–47 (7th Cir. 2006) (citations omitted); *see also Harper*, 494 U.S. at 225 ("The State has undertaken the obligation to provide prisoners with medical treatment consistent not only

499

with their own medical interests, but also with the needs of the institution. Prison administrators have . . . the duty to take reasonable measures for the prisoners' own safety.").

■

¶ 14. We thus accept without further discussion that Saenz possesses a constitutionally based liberty interest in avoiding unwanted forced nutrition and hydration, but that the Department, in pursuit of legitimate and countervailing interests, may, under certain circumstances, infringe upon Saenz's liberty interest by forcing him to ingest food and fluids against his will. Therefore, the only dispute we need to resolve in this case involves what procedural steps must be taken, either administratively or in proceedings before the circuit court, in order to provide Saenz the due process guaranteed him under the Fourteenth Amendment before his liberty interest is infringed upon.[3] The Department maintains that the steps it took and the proceedings conducted in the circuit court were sufficient to pass constitutional muster. Saenz claims not only that the steps taken in this case were insufficient to satisfy the constitutional guarantee of due process, but also that all of the procedural protections provided to the inmate in *Harper* must be implemented before a Wisconsin inmate may be forcibly fed and hydrated. We agree with Saenz's first contention but not his second.

---

[3] Saenz asserts in a footnote in his opening brief that the Department and circuit court also violated rights guaranteed him under article I, section 1 of the Wisconsin Constitution. He states that he makes the claim in order to preserve his right to make such an argument in the supreme court should this case be reviewed by that court. Because no further arguments based on the Wisconsin Constitution are made by either party, our analysis addresses only Saenz's Fourteenth Amendment claim.

¶ 15. We begin our procedural due process analysis by describing the facts and holding in *Harper*, 494 U.S. 210. The Supreme Court stated the "central question" in *Harper* was "whether a judicial hearing is required before the State may treat a mentally ill prisoner with antipsychotic drugs against his will," and that answering it required the Court to discuss the "protections afforded the prisoner under the Due Process Clause of the Fourteenth Amendment." *Id.* at 213. Harper, a Washington state prison inmate, had refused to take medications prescribed to treat his mental illness. *Id.* at 214. The institution at which Harper was incarcerated had adopted a formal policy establishing procedures to follow when a prisoner refused to take prescribed medications for a diagnosed mental illness. *Id.* at 215. The policy included the following provisions: (1) forced medication could only be sought if the prisoner suffered from a "mental disorder" and was either "gravely disabled" or was likely to cause serious harm to himself, others or property; (2) a psychiatrist must order the medication; (3) if the inmate refused the medication, a hearing was to be conducted before a psychiatrist, a psychologist and a prison official, none of whom were involved with the prisoner's diagnosis or treatment; and (4) if the psychiatrist and one other committee member determined that the stated criteria were met, medication could be administered against the prisoner's will. *Id.* at 215–16.

¶ 16. The inmate's procedural rights under the Washington policy included these: (1) the involuntary medication hearing could not occur on less than twenty-four hours' notice to the inmate; (2) the inmate was to be provided with notice of his diagnosis, its factual basis and the rationale for the medication at issue; (3) the

501

inmate had the right to attend the hearing, to present evidence and witnesses, and to be assisted by a lay adviser not involved in the case but knowledgeable of the issues; (4) the inmate must be provided with minutes of the hearing and could appeal to the institution superintendent and ultimately seek judicial review in state court. *Id.* at 216. Any involuntary medication order could continue only with periodic review, the first after seven days by a similarly constituted committee of three, and thereafter, the treating psychiatrist was to submit reports to the Department of Corrections medical director every fourteen days. After six months, a new hearing was required to consider the need for continued treatment. *Id.* at 216 & n.4.

¶ 17. Harper sued prison officials in state court under 42 U.S.C. § 1983, claiming, among other things, that his forced medication without a prior judicial hearing violated the Due Process Clause. *Id.* at 217. A trial-level court ruled against Harper, but on appeal, the Washington Supreme Court concluded Harper could be involuntarily treated only after a judicial hearing at which he was entitled to "the full panoply of adversarial procedural protections." *Id.* at 218. On certiorari to the U.S. Supreme Court, the Court had no difficulty concluding that, in addition to the rights granted him under the correctional institution's policy, Harper had a constitutionally based "liberty interest in avoiding the unwanted administration of antipsychotic drugs." *Id.* at 221. Then, under the "reasonably related to legitimate penological interests" standard that we have noted above, the Court concluded that Washington's policy "comports with constitutional requirements," *id.* at 225, in that "the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate

502

is dangerous to himself or others and the treatment is in the inmate's medical interest," *id.* at 227.

¶ 18. As we have discussed, it is not necessary in this appeal for us to engage in a similar weighing of the Department's interests in not allowing Saenz to starve to death against Saenz's liberty interest in not being forcibly fed and hydrated. The parties are in essential agreement that, under appropriate circumstances and after affording sufficient procedural due process, the Department may, without violating the Constitution, forcibly feed and hydrate Saenz. The dispositive questions are: what procedural steps are constitutionally required and were they provided on the present record? It is thus the final portion of the *Harper* decision that is of most relevance to the present dispute.

¶ 19. In determining the procedural steps required to satisfy due process in *Harper*, the Court applied the following standard and considered the following factors, which the Department acknowledges also apply here:

> The procedural protections required by the Due Process Clause must be determined with reference to the rights and interests at stake in the particular case. The factors that guide us are well established . . . . [W]e consider the private interests at stake in a governmental decision, the governmental interests involved, and the value of procedural requirements in determining what process is due under the Fourteenth Amendment.

*Harper*, 494 U.S. at 229 (citing, among other cases, *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).[4] The

---

[4] The formulation in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), which the Department cites in its brief, is worded somewhat differently, but it is the substantive equivalent of that in *Harper*:

Court rejected the Washington Supreme Court's conclusion that the U.S. Constitution requires a judicial hearing before Harper could be involuntarily medicated. *Id.* at 228. It concluded instead that the Washington procedure authorizing a panel that included medical professionals to determine whether the established criteria for involuntary medication had been established satisfied the constitutional mandate of due process. *Id.* at 231–35.

¶ 20. The Court also summarily disposed of Harper's other challenges to the Washington policy:

> The procedures established by the Center are sufficient to meet the requirements of due process in all other respects, and we reject respondent's arguments to the contrary. The Policy provides for notice, the right to be present at an adversary hearing, and the right to present and cross-examine witnesses.

*Id.* at 235. More specifically, the Court rejected Harper's contentions that formal rules of evidence should apply at the administrative hearing and that a "clear . . . and convincing" evidentiary standard should apply. *Id.* Finally, the Court concluded that representation by legal counsel was *not* a constitutional necessity, given that the policy called for "an independent lay adviser who understands the psychiatric issues involved." *Id.* at 236.

[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

¶ 21. Saenz contends that, because the U.S. Supreme Court found Washington's policy and the procedures reviewed in *Harper* sufficient to meet procedural due process guarantees, the same rights, at a minimum, must be accorded him prior to implementing forced feeding and hydration. We reject the contention for two reasons. First, as a matter of logic, it does not follow that, because a court finds certain procedures to satisfy due process, only those procedures and no others will suffice. Second, nowhere in *Harper* does the Court suggest that the Washington procedures it reviewed constituted a mandatory or minimum level of due process protections that a state must observe whenever imposing involuntary medical treatment on a prison inmate. Rather, its holding was specific and limited:

> [W]e hold that *the regulation before us is permissible* under the Constitution. It is an accommodation between an inmate's liberty interest in avoiding the forced administration of antipsychotic drugs and the State's interests in providing appropriate medical treatment to reduce the danger that an inmate suffering from a serious mental disorder represents to himself or others. *The Due Process Clause does require certain essential procedural protections, all of which are provided by the regulation before us.*

*Id.* at 236 (emphasis added). Simply put, the *Harper* holding tells us that the Washington procedures satisfy the Due Process Clause, but it does not say that others may not. Thus, the question we must answer is whether Saenz was accorded the "essential procedural protections," *see id.*, guaranteed him under the U.S. Constitution.

¶ 22. Like Harper's interest in avoiding the "unwarranted administration of antipsychotic drugs," Saenz's interest in avoiding "unwarranted" forced nu-

trition and hydration "is not insubstantial." *See Harper*, 494 U.S. at 229. We accept for purposes of our analysis Saenz's assertion that the measures employed by Department personnel to implement the appealed order can and do cause an individual to endure "substantial pain and discomfort."[5] As the Supreme Court explained in *Harper*, notice and the opportunity to be heard at a meaningful time and in a meaningful manner are the bedrock principles of procedural due process that must be observed when a state correctional agency, in pursuit of legitimate penological interests, seeks to infringe upon an inmate's "not insubstantial" liberty interests. *See id.* at 229, 235.

¶ 23. Thus, the first question presented on the record before us is whether the circuit court erred when it issued an ex-parte order authorizing the Department to involuntarily feed and hydrate Saenz. We conclude that a court may enter a temporary ex parte order,

---

[5] Saenz acknowledges that no evidence in the record establishes what measures the Department employed to administer food and hydration to him, how frequently this may have occurred or how the measures affected Saenz. He contends, however, that the omissions are due to his being wrongly deprived of an evidentiary hearing in the circuit court. He asserts in his brief that he was "force-fed intravenously on three separate occasions directly following the issuance of the Order" and that he was strapped down in "five-point restraints" for three to five hours on each occasion. At the court hearing on Saenz's requests for an independent medical examination and an evidentiary hearing, Saenz told the court that he had been fed "intravenously" on "three or four different occasions." Although the record provides no specific evidentiary support for these assertions, the Department does not dispute that the methods employed to forcibly feed and hydrate Saenz are highly intrusive and cause, at a minimum, significant discomfort.

provided the Department establishes by way of affidavit, as it did in this case, that exigent circumstances exist requiring immediate involuntary treatment in order to avoid serious harm to or the death of an inmate. The duration of any ex parte order to forcibly feed and hydrate an inmate, however, should be only for as long as reasonably necessary to allow the court to conduct a hearing on the Department's petition. In so concluding, we perceive the present circumstances to be analogous to others where a temporary infringement upon a person's liberty is permitted under emergency circumstances that require prompt intervention by government actors in order to avoid serious harm to the person or others. *See, e.g.,* WIS. STAT. §§ 51.15 and 51.20(2) (2003–04) (allowing immediate, temporary detention of an individual in a mental health facility for up to seventy-two hours until a probable cause hearing is held); WIS. STAT. § 55.06 (similar provision for "[emergency] protective placement" of an individual).[6]

¶ 24. Because we are an error-correcting court, *see Jackson v. Benson*, 213 Wis. 2d 1, 18, 570 N.W.2d 407 (Ct. App. 1997), *reversed on other grounds*, 218 Wis. 2d 835, 578 N.W.2d 602 (1998), it is not our role to decree a specific time limit after the issuance of an ex parte order within which a circuit court must conduct an initial hearing on a petition for forced nutrition or hydration. We conclude only that the court must do so as soon as reasonably possible and that did not happen in this case. The circuit court's ex parte order was, on its

---

[6] We note as well that WIS. STAT. ch. 813 allows for ex parte restraining orders, but only on a "temporary" basis. *See, e.g.,* WIS. STAT. §§ 813.02(1); 813.025(2); 813.12(2m) and (3); 813.122(3) and (4). All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

face, an indefinite or permanent order. No court proceedings were conducted until some three weeks after entry of the ex parte order, and then only because Saenz contacted the court with requests for an independent medical examination and an evidentiary hearing. The circuit court erred by entering an indefinite, ostensibly permanent, ex parte order to involuntarily feed and hydrate Saenz.

¶ 25. The next question therefore becomes whether the proceedings that ensued after Saenz made his requests provided him with sufficient due process to allow us to affirm the circuit court's continuation of the involuntary treatment order. We conclude that they did not. Specifically, Saenz should have been granted the right to an evidentiary hearing when he disputed the Department's allegations that he was refusing to drink fluids. Accordingly, we reverse the appealed order and remand to the circuit court for an evidentiary hearing. We conclude that Saenz must be allowed to meaningfully participate in the evidentiary hearing, but we reject his claims that he is entitled to be examined by an independent, court-appointed physician and that he must be provided with legal counsel to contest the Department's petition. Finally, we conclude that any order for involuntary feeding and hydration cannot be of indefinite or permanent duration without some mechanism for periodic review of whether circumstances continue to justify forced medical intervention of the type ordered in this case. We address these matters in the paragraphs that follow.

¶ 26. We acknowledge that, given the nature of the intrusion, one could well argue that the Department should be required to present evidence in every case to support a request to forcibly feed and hydrate an

inmate before the circuit court enters other than an emergency temporary order to that effect. Alternatively, as the Department contends, an evidentiary hearing might only be deemed constitutionally necessary when an inmate disputes one or more of the material allegations of the Department's petition (e.g., that the inmate is refusing to eat or drink; that, as a result, his or her health has significantly deteriorated; and that serious harm or death are imminent absent a forced intervention). We conclude that we need not decide whether an evidentiary hearing must be held on every petition because, in this case, Saenz disputed a material allegation of the Department's petition. The Department was thus required to present proof that the order it sought was medically necessary and justified by the circumstances.

¶ 27. At the hearing the circuit court conducted on his requests, Saenz, appearing by phone from the prison, asserted that he had been "eating and drinking . . . I drank like ten cups of [water] . . . right in front of 'em." He also said that he "intend[ed]" to dispute other facts in the petition, although his other objections are not easy to glean from the hearing transcript. Nonetheless, unlike the circuit court, which concluded that Saenz "failed to in any way controvert the important facts" in the Department's affidavits, we are satisfied that Saenz's statements that he disagreed with the Department's allegations and that he had in fact been "eating and drinking" were sufficient to put the Department to its proof. Because no evidentiary hearing was conducted to allow Saenz to contest the factual basis for the Department's petition, we reverse the appealed order and remand to the circuit court so that it may conduct a hearing at which the Department must establish the

necessity of an order to involuntarily feed and hydrate Saenz.[7]

¶ 28. Because we remand for an evidentiary hearing, we also address the showing the Department must make in order to obtain the order it seeks in this action, as well as certain other issues that are likely to arise on remand. We conclude the Department's petition adequately sets forth the necessary elements it must prove in order to involuntarily treat Saenz: (1) that he has refused to consume food and fluids sufficient to maintain his health for an extended period; (2) that, as a result, he has been diagnosed by a physician as

---

[7] The circuit court made clear to Saenz during the hearing conducted on his requests that he would have to identify at the hearing the facts set forth in the Department's petition and affidavits that Saenz maintained were untrue. Therefore, in concluding that Saenz disputed a material fact that necessitated an evidentiary hearing, we rely on only his assertions communicated to the court at that hearing. We note, however, that, in his correspondence with the court that preceded the hearing, Saenz asserted that the "DOC petition and accompanied (sic) affidavits are laced with distortions, conjuring, half-truths, slant and the like." If viewed as a responsive pleading, Saenz's assertions could easily be deemed to be a general denial of the Department's material allegations. Saenz also specifically denied in his letter that he had made any statements to the effect that he was engaging in a hunger strike. He asserted that his recent behavior was "merely the symptom" of a serious mental illness from which he was suffering. These assertions could well be viewed as stating an affirmative defense to the Department's petition, in that they suggest the Department, rather than seeking to forcibly feed and hydrate Saenz, should instead provide treatment for his alleged mental illness. In short, we conclude that Saenz's written response to the Department's petition also demonstrates that an evidentiary hearing is required.

510

suffering from moderate to severe malnutrition, dehydration or other deleterious condition; and (3) that, pursuant to reliable medical opinion, Saenz is in imminent danger of suffering serious harm or death unless he is given medical treatment, including, if necessary, forced hydration and/or forced feeding. *Cf. Harper*, 494 U.S. at 227 (holding that the Due Process Clause permits the State to involuntarily treat a prison inmate who is seriously mentally ill "if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest.").

¶ 29.　We next consider the Department's burden of proof in establishing the foregoing elements. Given the significance of the State's interests in preserving Saenz's life and health, and notwithstanding the nature of the infringement on Saenz's personal liberty, we conclude that the ordinary civil burden, i.e., "the greater weight of the credible evidence[,] to a reasonable certainty," should govern. *See* Wis JI—Civil 200. The Supreme Court concluded in *Harper* that the Constitution did not require a higher burden ("clear, cogent, and convincing"), in part, because the standard at issue was medical in nature and the decision makers were medical professionals. *Harper*, 494 U.S. at 235. Here, of course, a judge and not a physician will be the decision maker, but we agree with the circuit court's observation that "a lay person . . . would know that somebody who had limited their hydration and food intake to the extent set forth . . . was in danger of the risk of possible death." Although medical testimony and opinion will be a necessary component of the Department's proof, we are satisfied that Saenz's due process guarantee is satisfied if the circuit court finds, to a reasonable certainty, by the greater weight of the

credible evidence presented at the hearing, that the Department has proven its material allegations.

■■■■■

¶ 30. We turn next to Saenz's participation in the evidentiary hearing. In order to be heard in a meaningful manner, Saenz must be allowed to be present at the hearing, to present evidence and testimony, including his own, and to cross-examine the Department's witnesses.[8] We also conclude that Saenz's opportunity to present testimony and evidence in opposition to the Department's petition would not be meaningful unless he is allowed to compel the testimony of witnesses, including WCI staff members and, perhaps, other inmates. We recognize, of course, that granting an inmate the unlimited opportunity to subpoena DOC staff and other inmates to testify at the hearing may invite

---

[8] The Department requested in a letter to the circuit court that Saenz be allowed to participate in court proceedings via one of the alternatives identified in Wis. Stat. § 807.04(2), which expressly applies to "hearings in which oral testimony is to be presented in an action or special proceeding that is commenced by a prisoner." The Department acknowledged in its letter that the instant action was not commenced by Saenz but asserted that the action was "necessitated by his conduct and accordingly, the accommodations referenced in Sec. 807.04(2) Stats., would be appropriate here." The Department also pointed to Wis. Stat. § 807.13(2), which permits oral testimony in civil proceedings to be presented "by telephone or live audiovisual means" under certain circumstances. As the Department acknowledged, on its face, § 807.04(2) does not apply to this action. Because the issue has not been briefed in this appeal, however, we leave to the circuit court the determination of what accommodations, if any, may be employed under § 807.13 or other authority to facilitate Saenz's participation and the presentation of testimony by other witnesses at the hearing on remand.

mischief or result in the unnecessary expenditure of resources. Accordingly, the circuit court should allow Saenz to identify any witnesses he wishes to call and require him to describe their expected testimony. The court may disallow Saenz the opportunity to compel the testimony of any witness to whom the Department objects, if, in the exercise of its discretion, the court determines that the testimony of the witness would be irrelevant to the issues being litigated, cumulative of other evidence, or if its probative value would likely be outweighed by other factors similar to those identified in WIS. STAT. § 904.03.[9]

¶ 31. We also conclude that Saenz cannot be denied the opportunity to be represented by counsel at the evidentiary hearing, if he can arrange for such representation. We are not persuaded, however, that the Constitution requires an attorney to be provided for him at public expense. Due process may, however, require the participation of a "lay adviser" as the procedure in *Harper* called for, or a "staff advocate" as DOC regulations provide for in disciplinary proceedings. From his pro se filings and arguments in the circuit court and his initial pro se briefs to this court, Saenz appears to be a lucid, intelligent and capable advocate for his own interests. We note, however, that, in some of his submissions, he claims to be suffering from a mental illness. It is not hard to imagine cases in which an inmate in Saenz's position would be patently incapable, for either physical or mental reasons, of opposing the Department's petition without some assis-

[9] As to the possible means of obtaining testimony from other inmates, DOC staff or any other witness whose testimony is permitted by the court, see WIS. STAT. § 807.13 and footnote 8.

tance. We conclude that the circuit court is in the best position to determine, based on the facts and circumstances present in a given case, whether, in order to be heard in a meaningful manner, the inmate must be provided with an adviser or advocate to assist the inmate in preparing for and participating in the hearing. If so ordered, the Department must supply an adviser or advocate who is not involved in the inmate's treatment but is knowledgeable concerning the medical matters at issue. *See Harper*, 494 U.S. at 236.[10]

¶ 32. We next address Saenz's contention that he is "entitled to an independent expert diagnosis supporting the requested treatment." We disagree. We conclude that Saenz's right to be heard at a meaningful time and in a meaningful manner does not require the circuit court to order an independent medical examination. We see no reason why Department-employed physicians or other medical staff would be motivated to falsify their observations or the results of medical tests, or to exaggerate their impressions of Saenz's condition and his need for forced nutrition and hydration. Implementation of the order the Department seeks confers no

---

[10] Our conclusion that appointed legal counsel is not constitutionally required in cases where the Department seeks an involuntary treatment order should not be interpreted as precluding a circuit court from exercising its inherent power to appoint counsel for an inmate whenever, in its judgment, the needs of the court or the interests of justice so require. *See Joni B. v. State*, 202 Wis. 2d 1, 18, 549 N.W.2d 411 (1996) ("We conclude that fundamental fairness requires that a circuit judge be given the discretion to make the determination of what due process requires on a case-by-case basis," including "an individualized determination of the necessity for appointment [of counsel] under the circumstances presented by the particular case.").

obvious benefit on institution medical staff, and, in fact, the order would appear to impose additional burdens on them. We are satisfied that requiring Department medical personnel to testify before the circuit court and be subjected to questioning from Saenz and from the court provides Saenz a meaningful opportunity to be heard.[11]

¶ 33. Finally, we address the question of the duration of any order for involuntary nutrition and hydration that may be entered following an evidentiary hearing on remand. As we have discussed above, any temporary ex parte order for forced nutrition and hydration should remain in effect only until the circuit court can reasonably convene an initial hearing on the Department's petition for involuntary treatment of an inmate. We also conclude that, given the nature of the intrusion and because the circumstances that necessitated involuntary treatment may change over time, any final order for forced nutrition and hydration may not be permanent or indefinite in duration unless the order includes a mechanism for periodic review. In this regard, we note that involuntary mental health commitment orders under WIS. STAT. § 51.20 are of definite duration and expire of their own accord unless the petitioner affirmatively seeks an extension. *See* § 51.20(13)(g). Even protective placement orders under WIS. STAT. § 55.06, which are expressly premised on a showing that an individual's disabling condition is "per-

---

[11] In this regard, we note that the administrative procedure reviewed and approved in *Harper* called for review by a committee composed of institution staff members not directly involved in treating the subject prisoner, one of whom was required to be a physician. The Washington policy, however, contained no provision for independent or outside medical examinations or evaluations. *See Harper*, 494 U.S. at 215–16.

manent or likely to be permanent," are subject to required annual reviews by the court. *See* § 55.06(2)(d) and (10); *County of Dunn v. Goldie H.*, 2001 WI 102, ¶ 46, 245 Wis. 2d 538, 629 N.W.2d 189.

¶ 34. As we have explained, we see our role as being limited to correcting the error stemming from the denial of Saenz's right to procedural due process in the proceedings thus far. We therefore decline to order in this opinion a specific durational limitation or review mechanism for a final treatment order. After hearing the evidence regarding Saenz's current circumstances, and after taking into account the parties' respective interests and any practical considerations involved, the circuit court, if it enters an order for involuntary feeding and hydration, should include in the order either a provision limiting its duration or one requiring periodic review with reports to the court of Saenz's condition.

¶ 35. In closing, we note that, although we reverse and remand, we do not criticize the circuit court's initial handling of this action. We find the court's actions understandable given the lack of guidance in Wisconsin statutes or case law on the issues presented, and given the absence of any Department policy or regulation addressing Saenz's due process rights in view of the Department's intended actions. The Department insisted in the circuit court, as it does in this appeal, that it was entitled to have a permanent order authorizing it to forcibly feed and hydrate Saenz based solely on the affidavits it submitted to the circuit court. If the Department wishes to avoid protracted court proceedings under similar circumstances in the future, we encourage it to develop an administrative procedure that will provide inmates procedural due process prior to implementing a regimen of involuntary medical

treatment. Any such administrative determination would, of course, be subject to certiorari review in the circuit court, but a Department-administered procedure would have the benefit of establishing a uniform and consistent method of addressing "hunger strikes" or other circumstances the Department believes merits the forced medical intervention it seeks in this action. Moreover, a Department procedure would relieve the circuit court of the necessity of conducting de novo proceedings and fashioning procedures on a case-by-case basis to ensure that an inmate's right to due process is observed.

## CONCLUSION

¶ 36. For the reasons discussed above, we reverse the appealed order and remand the cause to the circuit court for further proceedings consistent with this opinion.

*By the Court.*—Order reversed and cause remanded with directions.