IN the MATTER OF Warren LILLY, Jr.:

WISCONSIN DEPARTMENT OF CORRECTIONS,
Petitioner-Appellant,

v.

Warren LILLY, Jr., Respondent-Respondent.

Court of Appeals

*No. 2009AP1420. Submitted on briefs February 15, 2011.
—Decided August 18, 2011.*

2011 WI App 123

(Also reported in 804 N.W.2d 489.)

On behalf of the petitioner-appellant, the cause was submitted on the briefs of *R. Duane Harlow*, assistant attorney general, and *J.B. Van Hollen*, attorney general.

On behalf of the respondent-respondent, the cause was submitted on the brief of *Jeff Scott Olson* of The *Jeff Scott Olson Law Firm*, S.C., Madison.

Before Lundsten, P.J., Vergeront and Higginbotham, JJ.

¶ 1. VERGERONT, J.   The Department of Corrections (DOC) appeals the circuit court order denying its request for continued authorization to forcibly provide Warren Lilly, Jr., with unwanted nutrition and hydration. The circuit court concluded that there were compelling circumstances here that warrant an exception to the standard we established in *DOC v. Saenz*, 2007 WI App 25, 299 Wis. 2d 486, 728 N.W.2d 765, for authorization to forcibly provide unwanted nutrition and hydration to an inmate.

¶ 2.   The primary issues we address on this appeal and their resolution are as follows:

I.   In light of *Saenz*, what is the correct legal standard for the showing DOC must make to obtain a court order continuing to authorize the forced feeding of an inmate?[1]

We conclude that in this situation DOC must show that: (1) if forced feeding is withdrawn, it is likely the inmate would continue his or her hunger strike; and (2) if the inmate does continue, the inmate would, based on reliable medical opinion, be in imminent danger of suffering serious harm or death. We also conclude that the "compelling circumstances" exception the circuit court employed is inconsistent with *Saenz*, and we therefore do not adopt it.

---

[1] For ease of reference, we use the terms "forced feeding" or "force feed" to include providing unwanted nutrition, unwanted hydration, or both.

II. In the context of DOC's application for initial or continued authorization to force feed an inmate, must the circuit court accord a presumption of validity to the opinions of qualified physicians on matters involving their professional judgment?

We conclude that in this context the circuit court must accord the physicians' opinions a presumption of validity. For the reasons we explain, we conclude that, when this standard is applied to the evidence here, DOC has established that it is entitled to an authorization of continued forced feeding of Lilly.

III. What is the correct legal standard for analyzing an inmate's objections to the manner in which the forced feeding has been carried out?

We conclude that objections to the manner of forced feeding that may implicate the Eighth Amendment are properly before the circuit court when DOC seeks an order continuing to authorize forced feeding of an inmate. For the reasons we explain, we hold that certain of Lilly's objections do not constitute an Eighth Amendment violation but we are unable to determine whether other objections do.

IV. What is the proper scope of an order authorizing a continuation of forced feeding for Lilly?

Consistent with the principle of deference to the professional judgment of the physicians treating the inmate, we conclude that, in general, an order authorizing, or continuing to authorize, forced feeding should not prescribe the specifics of how and when it is carried out. However, if the circuit court determines that any particular aspect of the manner in which forced feeding has been carried out constitutes a violation of an inmate's constitutional rights, the order authorizing forced feeding or continuing to authorize forced feeding must prohibit that particular practice or procedure.

¶ 3. Based on these conclusions, we reverse the circuit court's order and remand for further proceedings consistent with this opinion.

## BACKGROUND

¶ 4. Lilly was convicted in July 2003 of substantial battery with intent to cause bodily harm while armed with a dangerous weapon, in violation of Wis. Stat. §§ 940.19(3) and 939.63 (2001–02). He was sentenced to ten years in prison plus five years of extended supervision. He began a three-month hunger strike almost immediately upon starting to serve his sentence. The subsequent hunger strike relevant to this appeal began when Lilly stopped taking all solid foods in May 2004. DOC obtained a circuit court order that same month authorizing

> any licensed physician, or a person acting under his or her direction and control, [to] evaluate, and provide to Warren Lilly Jr., by force or otherwise, feeding or hydration, or both, which in his or her medical judgment is necessary to protect and maintain the health of Warren Lilly Jr., while he remains in the legal custody of the [DOC].

¶ 5. DOC began the forced feeding of Lilly in February 2005, when he stopped consuming any solids or liquids. The method of forced feeding is the delivery of a nutritional supplement by means of a tube that is inserted into his nose and goes to his stomach.

¶ 6. In May 2007, DOC petitioned the circuit court for an "update" of the May 2004 order because of this court's *Saenz* decision. In *Saenz* we established the procedural steps that are constitutionally required and the elements DOC must prove in order to force feed an inmate. After a hearing on DOC's petition, the circuit

193

court issued an order in January 2008 extending DOC's authorization for six months on the same terms as the preceding order, except that DOC could not force feed Lilly on Sundays.[2]

¶ 7.   In August 2008, in response to DOC's petition and after a hearing, the circuit court entered an order authorizing the forced feeding of Lilly for another year. This order carried forward the six-days-a-week limitation (unless Lilly requested a seventh day) and provided further detail on what was authorized in order to address complaints raised by Lilly. A month later, in response to additional complaints by Lilly, the court supplemented the August 2008 order with further directions on the precise method of feeding so as to minimize the duration of each feeding. The court emphasized that, while the August 2008 order allowed feedings up to fifteen minutes, the court anticipated they would take less time—six to nine minutes.

¶ 8.   The DOC petition that resulted in the order now being appealed was filed in February 2009.[3] The petition requested authorization to force feed Lilly seven days a week and to extend the feeding time in the restraint chair to forty-five minutes, with fifteen minutes of further observation in the restraint chair. The report of Dr. Paul Sumnicht, a physician at Waupun Correctional Institution, was attached to the petition. The report stated that Lilly was continuing to lose weight and was suffering from moderate malnutrition,

___

[2] Lilly appealed the January 2008 order but voluntarily dismissed it after filing this appeal of a subsequent order.

[3] DOC filed two petitions in February 2009, one on February 19, 2009, and one on February 23, 2009, because the physician's conclusions on Lilly's condition and what needed to be done changed over that time period. We treat the two petitions as one.

and his prognosis was slow steady deterioration to death in six months if his weight loss continued. The report stated that Lilly was openly and voluntarily vomiting immediately after feedings. Dr. Sumnicht's opinion was that the only way to address the vomiting was to give Lilly smaller amounts of the nutritional supplement over a longer period of time to make it harder to vomit up before it passed through the stomach and became absorbed.

¶ 9.  On February 27, 2009, shortly after the petition was filed, Lilly was admitted to the Dodge Correctional Infirmary because of his declining health. After two forced feedings there, with Lilly in a restraint chair, he agreed to take, and did take, water, the nutritional supplement, and certain food items he specified.

¶ 10.  At the time of the hearing on the petition, which was held over several days in April and May 2009, Lilly had not been force fed since February 28, 2009. He was still at the infirmary and still taking the water and food items he had agreed upon, but he had stopped taking the nutritional supplement about two weeks earlier. Lilly testified that he intended to resume his hunger strike.

¶ 11.  The physician at the infirmary, Dr. Barbara Bell, testified that Lilly's weight had increased and his health had improved since he began taking some food voluntarily. However, she stated, when he stopped taking the nutritional supplement, he lost ten pounds in three days. In her opinion, if he takes only water and the food items he was then voluntarily eating, he will again develop malnutrition, even if he manages to maintain his weight; and if he resumes a full hunger strike, his life and health will again eventually be in imminent danger.

¶ 12. Dr. Sumnicht testified, consistent with his report, on Lilly's condition between the end of October 2008 and the end of February 2009, when Lilly was under Dr. Sumnicht's care at Waupun and was engaged in a hunger strike. Lilly's weight in January 2009 was 125 pounds; he had lost twenty-two pounds since arriving at Waupun.[4] Dr. Sumnicht testified that Lilly has a history of heart failure, which makes lack of nutrition a particular threat to his health. When Dr. Sumnicht determined that Lilly was voluntarily vomiting, Dr. Sumnicht increased the amount of the nutritional supplement Lilly was being given at each feeding and had it administered in smaller quantities in order to allow more of the nutrients to get into his system. In Dr. Sumnicht's opinion, if Lilly continued to refuse to consume, retain, and absorb foods and liquids, he would be in imminent danger of serious harm or death.

¶ 13. Dr. Sumnicht testified that the restraint chair is the best and safest option for getting nutrition into Lilly, given that he is committed to purging: it stabilizes him so that insertion of the tube can be done gently and he cannot tip the chair over, his hands are restrained behind his back so he cannot pull the tube out, he cannot gag himself, and he cannot drink extra water.[5] Dr. Sumnicht testified that the restraint chair is safer for staff because it prevents Lilly from throwing body fluid, helps them observe for purging or dangerous behavior, and prevents Lilly from grabbing staff or equipment. Although the restraint chair cannot prevent Lilly from purging and although Lilly did not gain

_____

[4] Lilly testified that in 2003 he weighed 230 pounds.

[5] Dr. Sumnicht testified that Lilly had been drinking water before the feedings, which made it easier to vomit. This was addressed by turning off the water in his cell one hour before feedings.

196

weight with the slower feeding, in Dr. Sumnicht's opinion the extended feeding in the restraint chair was effective because Lilly's white blood cell count and salt level improved. This indicated that some of the nutrition was getting through despite his purging. Dr. Sumnicht testified that an alternative would be to sedate Lilly, but that is an extremely invasive and dangerous procedure.

¶ 14.   Dr. David Burnett, medical director of DOC Bureau of Health Services, also addressed Lilly's condition just prior to his admission to the infirmary. In Dr. Burnett's opinion, Lilly was then severely malnourished and, coupled with his cardiac condition, Lilly had significant chance of sudden cardiac death. Dr. Burnett opined that much of the drop in Lilly's weight from December 2008 to January 2009 was due to the court-ordered restriction to feedings of no more than fifteen minutes on only six days a week. He agreed with Dr. Bell's opinion that, if Lilly continues eating only the limited foods he was eating at the time of the hearing, he will again become malnourished.

¶ 15.   Lilly testified to the purpose of his hunger strike, which is primarily to bring public attention to a number of injustices in the judicial and prison systems and secondarily to "disrupt things as they are in the DOJ/DOC, and to create expenses for it which exacerbate its present precarious financial condition." He also described the discomfort, pain, and ill health the forced feeding in the restraint chair has caused him; and he described the behavior of some health care staff and other prison staff, including the use of force, that—along with use of the restraint chair—are in his view punishment for conducting the hunger strike.

¶ 16.   In addition to Lilly and the three physicians, there were two other witnesses: Christopher Cooper,

197

DOC security training captain, and Belinda Schrubbe, health service unit manager and registered nurse at Waupun Correctional Institution. Besides hearing from the witnesses, the court observed a video recording of two sessions of the forced feeding of Lilly in a restraint chair, one of which took place at Waupun and the other at the Dodge infirmary.

¶ 17. In a written decision the circuit court concluded that no further forced feeding of Lilly should be authorized, and it ordered that all previous authorization be terminated.[6] The court explained its view that a "compelling circumstances" exception should be "engrafted" onto the standards and procedures we established in *Saenz*, and the court found that compelling circumstances exist in this case.

¶ 18. Among the facts found by the circuit court that, in its view, contribute to compelling circumstances are the following.[7] Lilly is a highly intelligent and well-educated man and has never been diagnosed with a mental illness. He is committed to advancing his goals through a hunger strike, but he has stated repeatedly that he has no intention of committing suicide. His is the longest known hunger strike in Wisconsin and, as a

---

[6] The court's Memorandum Decision and Order Terminating Force Feeding and Injunction Against Force Feeding contained a number of provisions in the order section. The circuit court issued a Revised Order that did not substantively alter the memorandum decision but clarified the court's ruling on pending motions and amended the order section accordingly. It is the Revised Order that we consider on appeal when discussing specific rulings made by the court.

[7] The court set forth thirty-seven numbered factual findings at the end of its memorandum decision but made numerous additional factual findings in the course of the decision. We have drawn from both.

result of frustrations on both sides, a significant level of animosity exists between Lilly and DOC staff. The extended use of the restraint chair has not resulted in any appreciable weight gain because Lilly has developed the unusual ability of vomiting the nutritional supplement without sticking his finger in his mouth while the supplement is being administered. Use of the restraint chair has caused bruising to his body and numbness in his fingers (because his hands are restrained) and has contributed to his decline to the point where Lilly believes DOC is trying to kill him. The pattern of conduct by DOC staff, including extended use of the restraint chair, seems to reflect the goal of punishment, rather than maintenance of Lilly's good health, and the goal of discouraging him from continuing the hunger strike. This is attributable to the dual loyalty of the DOC physicians and nurses to the institution and to the patient. The World Medical Association, among others, has condemned the forced feeding of competent adult hunger strikers, and the extended use of the restraint chair on hunger strikers has been condemned by a number of authors and medical ethicists. Additional factual findings of the court will be discussed later in the opinion.

¶ 19.   The circuit court denied DOC's request for relief pending appeal and this court affirmed that decision.[8]

## DISCUSSION

¶ 20.   On appeal DOC challenges the circuit court's adoption of an exception to *Saenz* and challenges a number of the court's factual findings on the ground

---

[8] The circuit court granted relief pending appeal on one point in its order that is not relevant to this appeal.

that the court improperly gave little or no weight to the physicians' opinions. DOC asks that we reverse the court's order terminating any forced feeding of Lilly as well as the related orders. DOC also asks that we remand with directions to the circuit court to enter an order allowing forced feeding on the terms of the original order—that is, with no limitations except that the forced feeding must be under the direction and control of a licensed physician and must be necessary, in the judgment of the physician, to protect and maintain Lilly's health.

¶ 21. Lilly responds that the circuit court's weighing of Lilly's constitutional interest in refusing unwanted nutrition and hydration against DOC's penological interests is consistent with *Saenz* and other case law. He also argues that we must defer to the court's findings of fact.[9]

¶ 22. The parties' arguments present these primary issues:

I.   In light of *Saenz*, what is the correct legal standard for the showing DOC must make to obtain a court order continuing to authorize the forced feeding of an inmate?

---

[9] The circuit court, at Lilly's request, appointed an attorney to represent Lilly. That attorney withdrew, with the court's permission, as did a second attorney appointed by the court. After the court denied Lilly's request to have an attorney of his choice paid for by the court, Lilly proceeded pro se in the circuit court; and he filed his responsive appellate brief pro se. We determined that our consideration of the significant issues raised by this appeal would benefit from an attorney's briefing of Lilly's arguments. With Lilly's consent, we appointed Jeff Scott Olson of The Jeff Scott Olson Law Firm, S.C., to represent Lilly on this appeal on a pro bono basis. We express our appreciation to Attorney Olson for accepting the appointment. We clarify here that the appointment is for this appeal only and does not obligate Attorney Olson to represent Lilly on remand.

II. In the context of DOC's application for initial or continued authorization to force feed an inmate, must the circuit court accord a presumption of validity to the opinions of qualified physicians on matters involving their professional judgment?

III. What is the correct legal standard for analyzing an inmate's objections to the manner in which the forced feeding has been carried out?

IV. What is the proper scope of an order authorizing a continuation of forced feeding for Lilly?

¶ 23. The resolution of these issues and the sub-issues we address involves determining the correct constitutional standards and determining whether the evidence fulfills these legal standards. Because these are questions of law, our review on these issues is de novo. *See Lomax v. Fiedler*, 204 Wis. 2d 196, 206, 554 N.W.2d 841 (Ct. App. 1996); *Cheryl F. v. Sheboygan County*, 170 Wis. 2d 420, 425, 489 N.W.2d 636 (Ct. App. 1992). In applying the correct legal standard to the evidence, we accept the circuit court's factual findings unless they are clearly erroneous, meaning that they are not supported by the record. *Schreiber v. Physicians Ins. Co.*, 223 Wis. 2d 417, 426, 588 N.W.2d 26 (1999) (citations omitted). However, as we explain in section II, we do not accept factual findings that do not apply the correct analysis to the opinions of the testifying physicians.

I. Legal Standard for Continuation of Authorization for Forced Feeding in Light of *Saenz*

¶ 24. We begin with a discussion of *Saenz*. In *Saenz* we reviewed an order—entered ex parte and without a subsequent evidentiary hearing—that autho-

rized providing an inmate with "any medication, feeding or hydration, by force or otherwise" that in the medical judgment of a licensed physician was "necessary to protect and maintain the health" of the inmate. *Saenz*, 299 Wis. 2d 486, ¶¶ 1, 5, 9. At the outset, we noted that DOC conceded that the inmate had a constitutional liberty interest in avoiding unwanted medical treatment, including unwanted nutrition and hydration; and we noted that the inmate conceded that his interest could be balanced against DOC's legitimate governmental and penological interests in preventing him from starving to death. *Id.*, ¶ 12. We did not simply assume these concessions were correct. We confirmed their correctness:

> [W]e note briefly that the parties' concessions are well founded. The United States Court of Appeals for the Seventh Circuit has recently summarized applicable constitutional holdings in this area:
>
> > Free people who are sane have a liberty interest in refusing life-saving medical treatment, *Cruzan v. Director, Missouri Dep't. of Health*, 497 U.S. 261, 278–79, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990), and likewise in refusing to eat . . . . But either prisoners don't have such an interest, or it is easily overridden.
> >
> > The reasons are practical . . . . If prisoners were allowed to kill themselves, prisons would find it even more difficult than they do to maintain discipline, because of the effect of a suicide in agitating the other prisoners. Prison officials who let prisoners starve themselves to death would also expose themselves to lawsuits by the prisoners' estates. Reckless indifference to the risk of a prisoner's committing suicide is a standard basis for a federal civil rights suit. The idea behind liability in such cases is that incar-

ceration can place a person under unusual psychological strain and the jail or prison [is] under a commensurate duty to prevent the prisoner from giving way to the strain. The analysis is applicable when suicide takes the form of starving oneself to death.

So at some point in [the inmate]'s meal-skipping the prison doctors would have had a duty and certainly a right to step in and force him to take nourishment.

*Freeman v. Berge*, 441 F.3d 543, 546–47 (7th Cir. 2006) (citations omitted); *see also* [*Washington v.*] *Harper*, 494 U.S. [210,] 225 [(1990)] ("The State has undertaken the obligation to provide prisoners with medical treatment consistent not only with their own medical interests, but also with the needs of the institution. Prison administrators have . . . the duty to take reasonable measures for the prisoners' own safety.").

*Saenz*, 299 Wis. 2d 486, ¶ 13 (omissions and second and third alterations in original).

¶ 25. We then proceeded in *Saenz* to determine the steps that must be taken to satisfy an inmate's right to procedural due process before his or her liberty interest could be infringed upon. *See id.*, ¶ 14. The required procedures are: an evidentiary hearing as soon as reasonably possible after issuance of the ex parte order at which the inmate can meaningfully participate, and either a specified term for the order or periodic review if the order is indefinite or permanent. *Id.*, ¶¶ 25–33. We also established the substantive elements DOC had to prove to obtain an order for forced feeding:

(1) that [the inmate] has refused to consume food and fluids sufficient to maintain his health for an extended period; (2) that, as a result, [the inmate] has been diagnosed by a physician as suffering from moderate to severe malnutrition, dehydration or other deleterious

203

condition; and (3) that, pursuant to reliable medical opinion, [the inmate] is in imminent danger of suffering serious harm or death unless he is given medical treatment, including, if necessary, forced hydration and/or forced feeding.

*Id.*, ¶ 28 (citations omitted). These three elements establish that forced feeding is necessary for the health of the particular inmate.

¶ 26.   As both Lilly and DOC recognize, this case presents a different fact situation than does *Saenz* because here DOC is seeking to continue an order that authorized forced feeding. In this fact situation, the inmate has been force fed when necessary to avoid serious harm or death. The three *Saenz* elements do not address the necessity to an inmate's health of continuing an order. The circuit court recognized this in its January 2008 order and concluded that in this fact situation the showing DOC must make must focus on what would happen to the inmate's health if forced feeding were withdrawn. Both parties agree with this approach.

¶ 27.   We agree with the circuit court and the parties on this issue. While *Saenz* addressed initial authorization for forced feeding, it is consistent with *Saenz* to require that, when DOC seeks a continuation of that authorization, the focus is on what will likely occur if the authorization to force feed is terminated. In these circumstances we conclude that DOC must show that: (1) if forced feeding is withdrawn, it is likely the inmate would continue his or her hunger strike; and (2) if the inmate does continue, the inmate would, based on reliable medical opinion, be in imminent danger of suffering serious harm or death.

¶ 28.  However, we do not agree with Lilly and the circuit court on the creation of a "compelling circumstances" exception to *Saenz*. We understand the proposed exception to be this: although we ruled in *Saenz* that DOC could obtain an order authorizing forced feeding if the inmate was afforded the requisite procedural protections and if DOC proved the requisite substantive elements regarding necessity, where there are compelling circumstances DOC cannot prevail, even if it affords those procedural protections and proves the requisite substantive elements. We conclude that creating such an exception is inconsistent with *Saenz* and therefore is a modification of *Saenz*. This court does not have the authority to modify its opinions. *Cook v. Cook*, 208 Wis. 2d 166, 189–90, 560 N.W.2d 246 (1997). Any arguments for overruling, modifying, or withdrawing language from a published opinion of this court must be addressed to the supreme court. *See id.*

¶ 29.  Lilly contends that the circuit court's approach is consistent with *Saenz* because, according to Lilly, we held in *Saenz* that the circuit court need not defer to the judgment of DOC officials. Lilly relies on the following italicized language:

> We note further that Saenz makes no claim that anything in the Department's written policies, guidelines, rules or procedures violated his constitutional rights. Accordingly, we concur with Saenz's assertion that there is *no reason that our consideration of this appeal requires deference to the judgment of Department officials regarding policies that are claimed to be "reasonably related to legitimate penological interests."* See Harper, 494 U.S. at 223–24 [citing *Turner v. Safley*, 482 U.S. 78, 89 (1987)].

*Saenz*, 299 Wis. 2d 486, ¶ 12 (emphasis added).

205

¶ 30.    Lilly's argument is based on a misreading of *Saenz*. The point we make in the above quote is that there was no DOC regulation on forced feeding, and, therefore, the test established in *Turner* and applied in *Harper*—which addressed prison regulations—did not apply. That test "for determining the validity of a prison regulation claimed to infringe on an inmate's constitutional rights . . . ask[s] whether the regulation is 'reasonably related to legitimate penological interests.' " *Harper*, 494 U.S. at 223 (citing *Turner*, 482 U.S. at 89). However, although in *Saenz* we did not apply that particular test, we did adopt reasoning found in *Freeman*, 441 F.3d at 546–47, and concluded that penological interests warranted forced feeding when certain procedural protections were followed and certain substantive elements proved. *Saenz*, 299 Wis. 2d 486, ¶¶ 13–14, 23–34.

¶ 31.    In summary, when DOC seeks an order continuing to authorize the forced feeding of an inmate, the DOC must show that: (1) if forced feeding is withdrawn, it is likely the inmate would continue his or her hunger strike; and (2) if the inmate does continue, the inmate would, based on reliable medical opinion, be in imminent danger of suffering serious harm or death.

II.    Medical and Professional Opinions

¶ 32.    Having established the showing DOC must make to obtain a continuation of the order authorizing forced feeding of Lilly, we turn to the evidence before the circuit court. As for Lilly's intent to pursue his hunger strike if forced feeding is withdrawn, he testified that he intends to continue his hunger strike. We do not understand him to be arguing otherwise on appeal. Thus, the question is whether DOC has shown that, if Lilly does continue his hunger strike and if

206

forced feeding is withdrawn, he would, based on reliable medical opinion, be in imminent danger of suffering serious harm or death.

¶ 33.    Dr. Sumnicht opined that, if Lilly continued to refuse to consume, retain, and absorb foods and liquids, he would be in imminent danger of serious harm or death. Dr. Burnett expressed the same opinion. Drs. Bell and Burnett agreed that, although Lilly was taking water and some food items at the time of the hearing, if he continued with this course, he would again become malnourished; and if he resumed a full hunger strike, he would again be in imminent danger. There were no contrary medical opinions on these points.

¶ 34.    Lilly argues that extended forced feedings in the restraint chair have not been effective because he did not gain weight as a result, and therefore it logically cannot be true that, if forced feeding is withdrawn, he would be in a worse condition health-wise than if it continued. Lilly points to the circuit court's finding that Lilly's health had deteriorated with use of the restraint chair. We acknowledge this finding and note that it and certain other findings of the circuit court are inconsistent with the physicians' opinions. This raises the issue whether, in cases where DOC seeks authorization to force feed an inmate, the circuit court may choose to disregard the unrebutted opinions of the physicians. We turn to this issue.

¶ 35.    Dr. Sumnicht's conclusion that forced feeding over a longer period of time, in the restraint chair, was necessary to prevent serious harm or death to Lilly was based on a number of opinions he had reached in caring for Lilly over a period of four months. One significant opinion was that the reason Lilly had not gained weight despite the forced feeding was that he

was inducing himself to vomit the nutritional supplement. The circuit court found this was a reason for the absence of a weight gain, but the court also found another reason: that, by being "naked in a restraint chair [because Lilly refused to wear clothes at all times] for two hours or more, in a cold environment, a fair portion of the nutrition would be dissipated just in trying to shiver and stay warm." However, Dr. Sumnicht considered and rejected shivering as a cause of Lilly's failure to gain weight.

¶ 36.   A second significant opinion of Dr. Sumnicht was that, during the time period that extended feeding in the restraint chair occurred, Lilly's salt level and white blood cell count improved, and this meant his nutrition was improving despite his self-induced vomiting and despite the fact that he did not show a weight gain because of the vomiting. The circuit court either did not credit this testimony or did not consider that this improvement warranted continued use of the restraint chair.

¶ 37.   Another finding of the circuit court that does not take the medical opinions into account is the court's finding that Lilly is "familiar with the significance of the various readings on a metabolic panel and, although he is not a physician, this would certainly help him to gauge where he is at and to determine the mode and method of his continuing hunger strike." As we understand the court's reasoning, because of this familiarity and because Lilly does not want to die, it is less likely that he will die as a result of a hunger strike, although the court acknowledged that Lilly could make a misjudgment and die of cardiac arrest. Both Dr. Sumnicht and Dr. Burnett testified that, when someone is pursuing a hunger strike, even if he or she does not want to die, the effects of malnutrition impair the

ability to think clearly and to recognize when it is essential to start eating to avoid death.

¶ 38. The parties debate whether, as a general matter under state law, a fact finder may disregard an expert opinion when, as here, there is no contradictory expert opinion.[10] However, we conclude the proper framework for analysis is the one utilized in *Youngberg v. Romeo*, 457 U.S. 307 (1982), which addresses professional opinions in the context of considering the right of an involuntarily committed person to be free from restraint. In *Youngberg*, the Court stated that the State "may not restrain residents except when and to the extent professional judgment deems this necessary to assure such safety [of residents and personnel] or to provide needed training." *Id.* at 324. The Court explained that courts "must show deference to the judgment exercised by a qualified professional," meaning that "the decision, if made by a qualified professional, is presumptively valid." *Id.* at 322–23. Only if the decision by the professional "is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment" is liability imposed. *Id.* at 323.

¶ 39. This standard established in *Youngberg* has been applied by courts in the context of prisoners' challenges to bodily restraints, *see Wells v. Franzen*, 777

[10] DOC cites *Cogswell v. Robertshaw Controls Co.*, 87 Wis. 2d 243, 249–50, 274 N.W.2d 647 (1979) (we reverse a circuit court finding if a contrary finding constitutes the great weight and clear preponderance of the evidence), and Lilly cites *State v. Fleming*, 181 Wis. 2d 546, 561, 510 N.W.2d 837 (Ct. App. 1993) (jury was not required to accept a physician's opinion even if it was uncontradicted).

209

F.2d 1258, 1261–62 (7th Cir. 1985), and to unwanted medical treatment, *see White v. Napoleon*, 897 F.2d 103, 113 (3d Cir. 1990), and *McAleese v. Owens*, 770 F. Supp. 255, 258 (M.D. Pa. 1991). We are persuaded the rationale underlying this standard is applicable here. It is the duty of the courts to ensure that the professional judgment of the appropriate type of professional is exercised when an inmate's liberty interest is implicated. *See Wells*, 777 F.2d at 1261–62. However, courts are not better qualified than the appropriate professionals to make decisions requiring professional knowledge or training. *See Youngberg*, 457 U.S. at 322–23.

¶ 40. Applying this standard here, we conclude that a medical opinion is presumptively a "reliable medical opinion" within the meaning of the showing DOC must make when the opinion is that of a licensed physician who is qualified by training or experience to render the opinion and the opinion is based on a proper evidentiary foundation.[11] There is no dispute in the record that Dr. Sumnicht's opinions on Lilly's health and the need for extended forced feeding using the restraint chair meet these requirements. The same is true of the opinions of Drs. Bell and Burnett to which we refer in this opinion.

¶ 41. Because of the presumptive validity of the medical opinions that support the necessity for contin-

---

[11] We address in this section the opinions of physicians. However, as we note in paragraph 55, the opinions and decisions of nurses would also be entitled to the presumption of validity if they meet these criteria. Which other professionals in the prison system should have their opinions or decisions accorded a presumption of validity is not an issue we need to address on this appeal.

ued forced feeding, the circuit court must accept them unless there is evidence that they are a substantial departure from accepted medical judgment, practice, or standards. *See Youngberg*, 457 U.S. at 323. It is apparent that the circuit court evaluated the physicians' opinions without giving them a presumption of validity and rejected some of them without finding that they were a substantial departure from accepted medical judgment, practice, or standards. Indeed, there was no medical testimony opining that the physicians' opinions supporting the necessity of continued forced feeding was such a substantial departure.

¶ 42. However, some of the circuit court's findings on what the court viewed as compelling circumstances might arguably bear on whether the medical opinions supporting continued forced feeding are a substantial departure from accepted medical judgment, practice, or standards. We therefore examine these findings. We conclude that either these findings are not supported by evidence or, if supported by some evidence, the evidence does not, as a matter of law, meet the standard of showing a substantial departure from accepted medical judgment, practice, or standards.

■

¶ 43. First, as already noted, the circuit court found that the World Medical Association has condemned the forced feeding of competent adult hunger strikers and that the extended use of the restraint chair on hunger strikers has been condemned by a number of authors and medical ethicists. The record contains articles on these topics, as well as the World Medical Association Policy. The articles reflect divided views in the United States on the use of forced feeding in restraint chairs for competent adult hunger strikers. We therefore conclude these articles are not, as a matter

of law, sufficient to establish that Dr. Sumnicht's and Dr. Burnett's opinions recommending forced feeding in the restraint chair for Lilly are a substantial departure from accepted medical judgment, practice, or standards.

¶ 44. Second, the circuit court found that the medical staff had a dual loyalty—to Lilly, the patient, and to DOC. To the extent the court is inferring a dual loyalty from the opinions of Drs. Sumnicht and Burnett that extended use of the restraint chair is necessary to prevent imminent harm or death to Lilly if he continues to refuse food and liquid, such an inference is inconsistent with according those opinions a presumption of validity.[12] We have reviewed the record for evidence of a dual loyalty on their part, or on the part of Dr. Bell, that might reasonably be viewed as overcoming the presumption of the validity of their opinions, and we have found none.

¶ 45. Both Drs. Burnett and Sumnicht testified that it was difficult to treat Lilly because he was so determined to thwart their efforts to provide more nutrition and have him gain weight. When questioned by the court on a physician's ethical obligations when an inmate desires to refuse food and water, Dr. Burnett answered that the "correctional medicine doctor" has a primary obligation to the patient and acknowledged that it is difficult when a patient is trying to starve himself or herself to death. Dr. Burnett stated that, in

---

[12] One of the bases on which some of the exhibits discussed in paragraph 43 conclude that force feeding competent adult hunger strikers is unethical is that it involves a conflict of loyalty for the physician. To the extent the court's finding on the dual loyalty of the medical staff caring for Lilly is based on these exhibits, our conclusion in paragraph 43 applies.

the context of prison, there are additional considerations, such as the safety of others in the prison, and that the courts ultimately decide whether forced feeding in this context should be allowed. We conclude as a matter of law that this testimony cannot be reasonably viewed as evidence that the physicians' opinions on Lilly's health are a substantial departure from medical judgment, practice, or standards.

¶ 46. Third, the circuit court found there was evidence that the use of the restraint chair for extended periods of time was either for punitive purposes or to get Lilly to stop his hunger strike.[13] The court (without the benefit of a transcript) stated that Dr. Sumnicht had agreed, in response to Lilly's questioning, that the restraint chair was used specifically to try to discourage inmates from maintaining hunger strikes. However, this finding is not supported by the record. Dr. Sumnicht testified on direct examination and repeated on cross-examination that in his experience with other hunger strikers, when they were actually treated or experienced the restraint chair, they decided they did not want that and they were willing to cooperate. But he answered, "No, that would not be an accurate statement" to Lilly's question: "So your experience with the restraint chair has been, not that it's been an effective tool for handling the hunger strike, but it's been effective for ending them; would that be more accurate?" Drs. Bell and Burnett each testified that using the restraint chair to force feed Lilly is a means of

---

[13] For purposes of this discussion, we treat the circuit court's statements about the purposes of the professionals as findings of the court. At the same time, we acknowledge that it is sometimes unclear whether the court is making such a finding or is instead stating that Lilly believes these were their purposes and that Lilly may be correct.

maintaining his health and is not used as a means of punishment. We have located no testimony that would overcome the presumptive validity of the opinions of all three physicians that forced feeding of Lilly in the restraint chair for a longer period of time is necessary to provide him with nutrition, given his voluntary vomiting.

¶ 47. We conclude DOC has established by reliable medical opinion that, if Lilly pursues his hunger strike, he will be in imminent danger of suffering serious harm or death. This, together with Lilly's testimony that he intends to pursue his hunger strike, establishes that DOC is entitled to an order continuing to authorize the forced feeding of Lilly. We discuss in the next two sections the scope and terms of the order.

III.   Lilly's Objections to the Manner of Forced Feeding

¶ 48. In addition to arguing that DOC should not be authorized to force feed him at all, Lilly raised in the circuit court numerous objections to the manner in which the forced feeding was being carried out. The circuit court considered these objections in the context of deciding that compelling circumstances warranted an exception to *Saenz*, and we have rejected that approach. However, we have not yet addressed Lilly's position that the manner in which the forced feeding has been carried out violates his right to be free from cruel and unusual treatment under the Eighth Amendment.[14]

---

[14] We confine our discussion in this section to the Eighth Amendment. We note that neither party addresses whether Lilly's liberty interest in refusing unwanted food or hydration

¶ 49. The fact that the necessity of forced feeding to an inmate's health is shown by a reliable medical opinion does not insulate the manner in which the forced feeding is being carried out from constitutional scrutiny. *See Wells*, 777 F.2d at 1264 (fact that restraint is a proper treatment for an inmate who is a suicide risk does not insulate the conditions of restraint from Eighth Amendment scrutiny); *see also O'Malley v. Litscher*, 465 F.3d 799, 805–06 (7th Cir. 2006) (considering whether inmate's objections to the manner in which a forced feeding order was executed constituted Eighth Amendment violations and deciding that they did not). We therefore conclude that objections to the manner of forced feeding that may implicate the Eighth Amendment are properly before the circuit court when DOC seeks a continuation of authorization to force feed.[15]

---

affords Lilly protection in the manner in which the forced feeding is carried out, and, if it does, whether that protection is greater than that afforded by the Eighth Amendment. *See Wells v. Franzen*, 777 F.2d 1258, 1262 (7th Cir. 1985) ("Due process requires that the nature and duration of physical restraint bear some reasonable relation to the purpose for which it is prescribed.") (citation omitted); *see also Whitley v. Albers*, 475 U.S. 312, 327 (1986) (holding that in the context of an inmate's claim of excessive force, "the Due Process Clause affords . . . no greater protection than does the Cruel and Unusual Punishments Clause").

[15] While DOC has the burden of establishing the three substantive elements for initial authorization for forced feeding, *see DOC v. Saenz*, 2007 WI App 25, ¶ 29, 299 Wis. 2d 486, 728 N.W.2d 765, and the two substantive elements for continued authorization, *see supra* paragraph 27, we do not intend to suggest that, in order to obtain continued authorization, DOC has the burden of establishing that the manner in which the

¶ 50. The Eighth Amendment proscribes the unnecessary and wanton infliction of pain, and the conduct necessary to fulfill this standard depends on the nature of the alleged constitutional violations. *Hudson v. McMillian*, 503 U.S. 1, 5 (1992) (citing *Whitley v. Albers*, 475 U.S. 312, 320 (1986)). In the context of an inmate's medical needs, deliberate indifference to serious medical needs constitutes the unnecessary and wanton infliction of pain. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citation omitted). When the allegation is one of excessive force, the Eighth Amendment protects against force that is not applied in a good faith effort to maintain order but is maliciously and sadistically applied to cause harm. *Hudson*, 503 U.S. at 6–7.

¶ 51. Turning to Lilly's objections to the manner of forced feeding, we have already addressed the method of using the restraint chair for an extended period of time so that the nutrients can be more slowly administered with the goal of providing Lilly with more nutrition. As we have already explained, reliable medical opinion supports the medical necessity of this procedure. We therefore conclude that the use of the restraint chair for an extended period of time for this purpose does not violate the Eighth Amendment. *See Al-Adahi v. Obama*, 596 F. Supp. 2d 111, 120–21 (D.D.C. 2009) (use of restraint chair to force feed an inmate is

forced feeding has been carried out is constitutionally permissible irrespective of any objections raised by the inmate. Rather, when DOC has made the showing for continued authorization and the inmate objects to the manner in which the forced feeding has been carried out, it is the inmate's burden to establish a constitutional violation in the manner in which the forced feeding has been carried out.

not an Eighth Amendment violation when it is medically necessary to preserve the inmate's life).

¶ 52. However, Lilly has raised a number of other objections to the manner of forced feeding, including the manner in which the restraint chair is actually used. We are unable to resolve these other objections on this appeal because the factual record is complicated, the circuit court's fact finding is focused on a different legal theory, and the parties' arguments on appeal do not fully address these other objections. We conclude a remand is necessary for the court to address Lilly's other objections to the manner in which he has been force fed. To provide guidance on remand, we briefly discuss some of these objections.

¶ 53. Lilly has objected to the manner in which the security guards put him in the restraint chair and the manner in which he is restrained while he is in the chair. The circuit court made no findings on which decisions were made as a matter of security and which were medical decisions, but the court did find that Lilly had sustained some injuries as a result of the manner in which he was positioned and restrained in the chair. This appears to be a claim by Lilly that excessive force is used to place him and keep him in the chair. Whether the conduct to which Lilly objects constitutes an Eighth Amendment violation cannot be decided without the circuit court making additional findings of fact. *See Hudson*, 503 U.S. at 7 (noting factual inquiries that may be relevant when excessive force is claimed).

██ ██

¶ 54. Lilly's complaints also relate to the treatment by nurses involved in the forced feeding. While generally deliberate indifference to serious medical needs is not found if an inmate has received a course of treatment, care that is so inappropriate or inadequate

as to evidence "intentional maltreatment" violates the Eighth Amendment. *McAleese*, 770 F. Supp. at 258; *see also O'Malley*, 465 F.3d at 805–06 (recognizing that pain or injury resulting from being in a restraint chair for forced feeding could constitute an "objectively serious medical condition," but rejecting the Eighth Amendment claim because of an absence of deliberate indifference to that condition). It is important to note that an inadvertent failure to provide adequate medical care does not meet the standard of deliberate indifference to serious medical needs. *Estelle*, 429 U.S. at 105–06. Whether the conduct of which Lilly complains constitutes deliberate indifference to his serious medical needs cannot be decided without additional findings of fact.

¶ 55.   In considering whether Lilly's complaints about the nurses carrying out the forced feeding constitute an Eighth Amendment violation, the circuit court must bear in mind that the opinions and decisions of a nurse may be entitled to a presumption of validity. *See Youngberg*, 457 U.S. at 323 n.30 (explaining what the court there means by "professional" decisionmaker); *see also Wells*, 777 F.2d at 1262 (explaining what decisions involving restraint are appropriate for a psychiatrist and what are appropriate for a nurse). As with a physician, a nurse's opinions and decisions are entitled to a presumption of validity if the nurse is licensed, is qualified by training or experience to render the opinion or make the decision, and there is a proper evidentiary foundation. *See supra,* ¶ 40.

¶ 56.   Finally, we observe that Lilly presented a number of complaints to the circuit court that did not concern the manner in which he was being force fed:

other health care issues, as well as harassment and excessive force by prison staff in other situations. The circuit court credited Lilly's testimony on much of this and considered it as part of the circumstances the court found compelling. We conclude that, on DOC's petition for authorization or continued authorization of a forced feeding order, claims or complaints that do not concern the authorization or the manner in which forced feeding has been or will be carried out are not properly before the court. The purpose of the procedure and standards we established in *Saenz* and elaborate upon in this case is to ensure that any forced feeding is carried out consistent with the inmate's constitutional rights. Claims or complaints that fall outside that scope must be raised in another proceeding. DOC's request for an order authorizing or continuing to authorize forced feeding does not obligate the circuit court to address all of an inmate's complaints about his or her treatment in prison.

## IV. Scope of Order Granting Continued Authorization

¶ 57. DOC argues that upon remand it is entitled to an order that does not limit the time periods of forced feeding and does not specify the specific means, as did previous orders of the circuit court. DOC proposes that the order state that

> any licensed physician, or a person acting under his or her direction and control, may evaluate and provide to Warren G. Lilly, Jr. any medication, feeding or hydration, without Lilly's consent and by force or otherwise, which in said physician's medical judgment is necessary to protect and maintain the health of Warren G. Lilly, Jr. while he remains in the legal custody of the [DOC].

219

Lilly does not specifically address the scope of the authorization, should it be granted.

¶ 58.   We conclude that, as a general matter, an order authorizing or continuing to authorize forced feeding should not prescribe the specifics of how and when it is carried out. This is consistent with the principle, which we have already recognized, of deference to the professional judgment of the physicians treating the inmate.

¶ 59.   However, where, as here, the inmate raises objections to the manner in which the forced feeding has been carried out, the circuit court's resolution of these objections may affect the scope of an order for continued authorization. That is, if the court determines that some aspect of the manner in which the forced feeding has been carried out violates a constitutional right of Lilly, the court's order authorizing forced feeding must prohibit that particular practice or procedure. On the other hand, if the court determines that a practice or procedure to which Lilly objects does not constitute a constitutional violation, the court must not limit the exercise of professional judgment on that point, even if the court believes another practice or procedure is more beneficial to Lilly. *See Youngberg*, 102 U.S. at 323.

¶ 60.   We have already concluded that the necessity for use of the restraint chair for an extended period of time so that the nutrients can be more slowly administered to Lilly does not violate Lilly's Eighth Amendment rights. We also observe that there was testimony from Drs. Sumnicht and Burnett that it is necessary for the physicians treating Lilly to have the flexibility to adjust the length of time of the forced

feeding to meet changes in Lilly's health. Thus, this practice in itself does not warrant limiting use of the restraint chair to a particular time period.

¶ 61. However, the circuit court has yet to determine whether other objections by Lilly to the manner in which he has been force fed constitute violations of the Eighth Amendment. Therefore we cannot at this time determine how these objections might affect the scope of a proper order. This will be a matter for the circuit court to determine on remand after it has addressed Lilly's other objections to the manner in which he has been force fed.[16]

## CONCLUSION

¶ 62. We reverse and remand the circuit court's revised order terminating forced feeding and enjoining forced feeding and remand for further proceedings consistent with this opinion.

*By the Court.*—Order reversed and cause remanded with directions.

---

[16] On remand the circuit court may make findings of fact based on the evidence already in the record and need not take additional evidence. However, if the court determines it is appropriate to take additional evidence, the court may do so.